**Affirmed and Opinion Filed November 9, 2016**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-15-01359-CV

### IN THE INTEREST OF C.M.C., A CHILD, Appellant

**On Appeal from the 470th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 470-50545-06**

## MEMORANDUM OPINION

Before Justices Francis, Lang, and Stoddart
Opinion by Justice Francis

Father appeals the trial court's order modifying the parent-child relationship by reducing his possession of his daughter, C.M.C., and ordering him to pay child support. In two issues, Father contends the trial court abused its discretion because there is legally and factually insufficient evidence to support the modifications. In a third issue, he complains the trial court "potentially erred" by failing to make findings of fact and conclusions of law. We affirm.

In December 2005, C.M.C. was born to Mother and Father, who were never married. In August 2006, when C.M.C. was eight months old, Mother and Father entered an agreed order naming them joint managing conservators and setting out the terms and conditions of conservatorship, possession, and child support. Among other things, the order provided that once C.M.C. turned eighteen months old, Mother and Father would equally share possession of the child, alternating weeks, and neither party would pay child support. Mother, who lived in

McKinney, was given the right to establish the child's primary residence. Father lived in Lewisville.

In 2014, Mother filed a petition to modify the parent-child relationship, alleging material and substantial changes in circumstances since the 2006 order. Mother requested that Father be subject to a standard possession order, the parties have a mutual right of first refusal and reasonable telephone access with the child, and Father pay child support. Mother asserted the modifications were in C.M.C.'s best interest. Father filed a general denial and requested attorney's fees.

Three witnesses testified at trial: Mother, Father, and Father's wife (Stepmother), whom he married before C.M.C.'s birth. Mother testified the week-on/week-off possession schedule "no longer works" for C.M.C., who at the time of trial was nine years old and in the third grade. C.M.C. attended elementary school in McKinney. During the school year when Father had possession, which is ten school days of each month, C.M.C. rode in a car one-and-a half-hours each day, for almost seventy miles, traveling twice a day between Lewisville and McKinney. Mother said this had been the arrangement since C.M.C. started kindergarten.

On a typical school day, Mother picked up C.M.C. at an exchange point in Frisco at about 6:45 a.m. and drove her home to McKinney. Sometimes C.M.C. would eat breakfast in the car and sometimes she would sleep the entire ride home. Once home, generally about 7:10 a.m., Mother fed C.M.C. breakfast if she had not eaten in the car, got her dressed, made her lunch and snacks, and took her to school at about 7:50 a.m. On Mondays, Wednesdays, and Fridays, Mother picked up C.M.C. from school at 3:30 p.m., took her to her gymnastics class, and then dropped her off in Frisco at 6:30 p.m. On Tuesdays and Thursdays, Mother picked C.M.C. up at school and took her home for two hours before driving her to Frisco for pickup at 6 p.m. Mother testified she did all the exchanges on her end, and Father did the exchanges "on a very rare

occasion" and never in the past year. Rather, Stepmother did all the morning exchanges and all but a handful of the evening exchanges.

As for the effects of the schedule on C.M.C., Mother testified the child had a "very hard time" in the mornings and her "time on the road" was "too much." She said C.M.C. had trouble focusing at school, which progressed throughout the year. She also said C.M.C.'s teachers had noted the problem on C.M.C.'s report card. During her weeks with Father, C.M.C. had a "different attitude" and was "very sullen and very quiet." On the weeks she was not traveling between Lewisville and McKinney each morning, Mother said C.M.C. seemed "happier, more outgoing, more talkative, and [had] a lot less anxiety." By changing to a standard possession order during the school year, where C.M.C. could be home during the week, Mother believed C.M.C. "would have more structure and routine, and that would be best for her and her education . . . to get more rest."

In addition to evidence regarding the effects of the week-on/week-off possession schedule, Mother also presented evidence that she could not effectively co-parent with Father. Evidence showed Father had made derogatory and insulting comments to Mother, both before and after the filing of the petition for modification, including calling her a "POS," "stupid," "an idiot," "evil," and without a "conscience"; suggested she had "poor character and bad ethical qualities"; threatened to tell C.M.C. "what a whore" Mother was; said "dealing" with Mother had been a "gd nightmare"; and characterized C.M.C.'s situation as "unfortunate" because Mother did not take her birth control and thought she could "trap" him.

Mother also testified Father denied her telephone access with C.M.C. multiple times during his times of possession, and he refused to have conversations with Mother, instead requiring her to speak to Stepmother. Mother testified she had "no concerns" with Stepmother and generally communicated with her by text or email. Finally, evidence showed that when

–3–

C.M.C. was at Father's house, she called Stepmother "mom" and referred to Mother by her first name, and neither Father nor Stepmother thought that was a problem.

Father testified he believed the existing order was in C.M.C.'s best interest, saying it was all C.M.C. had ever known and she seemed "more well-adjusted now than ever." He said that when he and Mother agreed to shared possession, he understood his daughter would grow older, go to school, and participate in extracurricular activities. When asked about C.M.C. riding in a car nearly seventy miles a day for an hour and a half, Father said it was "fine," he did it as a child, and, as an adult, he commutes two and a half hours a day. He added, "If a child can't ride in a car for an hour and half 10 days a month, then something's wrong." Father said they had been doing the exchanges during the school year since 2012, and C.M.C.'s grades had not dropped. He also said C.M.C. had "always had a focus issue," which he attributed to Attention Deficit Disorder "to some degree." He talked to Mother about taking C.M.C. to the doctor, but Mother opposed "any kind of medication." Father believed switching C.M.C. from equal possession to standard possession would be detrimental to her mental health because she would see his family "very little," including her half-brothers, who were 21 and 17 years old at the time of trial.

As for co-parenting, Father said he "effectively co-parented" with Mother until she filed the petition to modify and "started coming after me for money." He believed the petition was prompted by a dispute over C.M.C.'s gymnastics classes. C.M.C. had moved into a higher level of gymnastics requiring four-hour practices twice a week during the summer. But, Father said, his family's plans did not allow for the "significant hours" because he had scheduled summer plans around his son's participation in select baseball. Up to that point, he said, "everything" had worked "fine." He acknowledged making disparaging comments about Mother, and in particular calling her "evil," "without a conscience," and a "whore," but said the remarks were

made in a moment of anger, and that Mother had also made "quite a few disparaging remarks" to him. He also acknowledged not allowing C.M.C. to talk to her Mother during his time of possession because it "disrupted her week," but he said he was now "willing to do that."

Stepmother described C.M.C.'s school day schedule during Father's possession. C.M.C. got up at 6:20 a.m. to leave at 6:30 to meet Mother, who took her home and dressed and fed her. The drive to the exchange point was about twelve to fifteen minutes, depending on traffic, and C.M.C. would sometimes sleep. On the drive home in the evenings, Stepmother said they would talk or C.M.C. would do homework. On three days, they arrived home by 6:45 p.m.; on the other two days, they arrived by 6:20 p.m. Once home, C.M.C. finished her homework, if she did not complete it during the car ride, and then had dinner. Stepmother said she tried to get C.M.C. "wound down" by 8:30 or 9 p.m. and bathed. Then, C.M.C. would read or play on her iPad before going to sleep. She acknowledged that during Father's weeks, Mother feeds C.M.C., gets her dressed, makes her lunch, takes her to school, and takes her to gymnastics.

Stepmother said C.M.C. had "no problems" getting up in the morning, but on some days, "like any kid," she was more tired than others. Stepmother, a teacher, agreed with Father that C.M.C. needed to be evaluated for ADHD. She agreed C.M.C. is unfocused at times, and reluctant to sit and do homework, but this is not at the "end of the day." She did not believe "it had anything to do with sitting in the car." Stepmother said changing the possession order would not "fix" C.M.C.'s focus issues, which are related to "how she's concentrating and listening to directions and what is being presented to her," and not where she is living.

Like Father, she believed the shared possession order was in C.M.C.'s best interest because this was all the child had known; changing times would be "very detrimental" and perhaps cause C.M.C.'s grades to "digress." She testified C.M.C. recently attended after-school tutoring to boost her confidence with the math and reading portions of the STARR examination.

Finally, Stepmother described her relationship with Mother as "[j]ust a drop-off and pick-up kind of relationship." She said they get along "okay" and generally communicate by texts. C.M.C. called her "Mom or Mommy" when at their home for as long as she could remember. She never insisted C.M.C. refer to her as mom, but believed she picked it up from her brothers.

After hearing the evidence, the trial court granted Mother's petition and specifically noted that the parent's inability to co-parent was a "huge problem," making reference to the "contempt and hostility" between the parties. The trial court asked Father if he "hated" Mother more than he loved C.M.C., and suggested Father's refusal to allow C.M.C. to talk to her Mother while at his house was a "subtle" way of expressing his disdain for Mother. As relevant here, the trial court changed the possession schedule to standard possession and ordered Father to pay $1,710 a month in child support.[1] The Father requested findings of fact and conclusions of law and, when the trial court failed to make them, filed a notice of past-due findings. None were made. Father also filed a motion for new trial, which was denied. Father appealed.

In his first issue, Father contends the trial court abused its discretion in modifying the 2006 order providing for alternating weeks of possession to a standard possession order because there was legally and factually insufficient evidence to do so. He contends the evidence does not show a material and substantial change in circumstances nor does it show the change was in C.M.C.'s best interest.

Regarding issues of conservatorship and possession and access, the primary consideration is always the best interest of the child. *See* TEX. FAM. CODE ANN. § 153.002 (West 2014); *Lenz v. Lenz*, 79 S.W.3d 10, 14 (Tex. 2002). We review a trial court's decision to modify an order

---

[1] The trial court also gave each party a right of first refusal for any period that a possessory parent is absent for more than six hours and enjoined each party from restricting electronic or telephone communications between C.M.C. and the other parent. Father does not appeal these modifications.

regarding conservatorship or the terms of possession and access to a child under an abuse of discretion standard. *In re M.A.M.*, 346 S.W.3d 10, 14 (Tex. App.—Dallas 2011, pet. denied).

A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex. 1985). Under this standard, legal and factual sufficiency are not independent grounds of error but are relevant factors in assessing whether the trial court abused its discretion. *In re C.H.C.*, 392 S.W.3d 347, 352 (Tex. App.—Dallas 2013, no pet.) (op. on motion for reh'g). The trial court does not abuse its discretion if some evidence of a substantial and probative character supports its decision. *Agraz v. Carnley*, 143 S.W.3d 547, 554 (Tex. App.—Dallas 2004, no pet.).

In making our review, we recognize the trial court is in the best position to observe and assess the witnesses' demeanor and credibility, and to sense the "forces, powers, and influences" that may not be apparent from merely reading the record on appeal. *In re A.L.E.*, 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.). Consequently, we defer to the trial court's resolution of underlying facts and to credibility determinations that may have affected its determination, and we will not substitute our judgment for the trial court's. *Id.*

A trial court may modify an order regarding possession or access to a child if it finds modification would be in the best interest of the child and, as it applies to this case, that the circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed since the date the order was rendered. TEX. FAM. CODE ANN. § 156.101(a)(1)(A) (West 2014). In deciding whether a material and substantial change of circumstances has occurred, a trial court is not confined to rigid or definite guidelines. *In re A.L.E.*, 279 S.W.3d at 428. Instead, the court's determination is fact-specific and must be made according to the circumstances as they arise. *Id.* The law does not prescribe any particular

method for showing changed circumstances, which may be established by circumstantial evidence. *Id.* at 429.

Father contends Mother failed to show a material and substantial change in circumstance, arguing nothing "much significant" had changed since the 2006 order and Mother had failed to show what had changed since the original order. He asserts that both parties live in the same residences as they did when the 2006 order was signed, C.M.C. had attended the same school since 2012, and they had been doing "basically the same" exchanges since that time.

The fact the parties had the same system in place since C.M.C. started kindergarten is of no moment; we consider the change in circumstance at the time of the original order when C.M.C. was eight months old. The evidence showed that while the parties agreed to shared possession beginning when C.M.C. was eighteen months old, circumstances had materially and substantially changed since she was an infant. Specifically, C.M.C. was in third grade and, according to her Mother and teachers, was having difficulty focusing at school. Mother attributed the lack of focus to a travel schedule that put C.M.C. traveling between Lewisville and McKinney, twice a day, beginning at 6:30 a.m., two weeks each month or half of all school days, for one and a half hours a day. On these days, C.M.C. eats, sleeps, and does homework in a car. According to Mother, C.M.C. was "very sullen" and "very quiet" during those weeks and had a lot less anxiety on weeks she did not have to travel. Although neither Father nor Stepmother believed C.M.C.'s focus issues were related to the possession schedule, the trial court judged the credibility of the witnesses and the evidence presented. And while her grades may not have dropped, evidence showed she was in after-school tutoring to work on her math and reading skills for the state-mandated test.

To the extent Father argues the only change in circumstance was C.M.C.'s age, we disagree. As we just explained, in addition to her age, C.M.C. was in school and was having

difficulty focusing. Regardless, a child growing older can, under certain circumstances, warrant a modification in a possession schedule, particularly when, as here, the child was an infant or toddler at the time of the original order and had aged several years at the time of modification. *See In re C.H.C.*, 392 S.W.3d at 351. Moreover, the "trio of decisions" relied upon by Father to show an abuse of discretion are unavailing. *See In re C.H.C.*, 392 S.W.3d at 351, *In re C.R.G.*, No. 05-10-01472-CV, 2012 WL 3133785 (Tex. App.—Dallas Aug. 2, 2012, no pet.) (mem. op.), *In re K.T.W.*, No. 05-08-01416-CV, 2010 WL 716417 (Tex. App.—Dallas Mar. 3, 2010, no pet.) (mem. op.).

In *C.H.C.*, a father sought to modify an order to obtain more time in the summer with his son and testified it would allow them to go camping, fishing, and enjoy the outdoor activities the two did together. 392 S.W.3d at 351. This Court concluded his testimony the trial court abused its discretion in granting the modification because the evidence did not establish any change in circumstances since the original order. *Id*. at 351–52. As we explained, C.H.C. was not an infant at the time of original order; rather, he was five years old, and he was ten years old at the time of modification. *Id*. Further, the father made no argument that C.H.C. could do more lake or camping activities than in 2004 when he was younger. *Id*.

In *K.T.W.*, the father saw his child on the weekends under a standard possession order. The father lived in Houston and the mother lived in Dallas, and the two met in Buffalo for the exchange of the child. 2010 WL 716417 at *2. Mother sought to modify the custody arrangement and testified K.T.W. was now in school and participating in sports and extracurricular activities, and the weekend travel was interfering with his testing in Taekwondo. She also claimed the weekend travel was "taking a toll" on her son because he was on the road two and three times a month. *Id*.

After hearing the evidence, the trial court reduced K.T.W.'s visitation with the father to only one weekend per month because of the "distance and travel time" from the parents' residences. *Id.* We reversed the trial court's order, explaining the evidence showed the distance between the parents' homes was slightly less since the original order and any alleged hardships in scheduling K.T.W.'s Taekwondo classes had been resolved. *Id.* at *3. Further, there was no other evidence regarding extracurricular, sports, or school-related conflicts or difficulties. Rather, the mother acknowledged the only change in K.T.W.'s circumstance was he had grown older. *Id.* We concluded there was no evidence to support a finding that the modification was in the child's best interest. *Id.* at *4.

In *C.R.G.*, the trial court modified an existing standard possession order to allow the sixteen-year-old child to refuse to permit her father to exercise his periods of possession. 2012 WL 3133785, at *1. The order had been in place since C.R.G. was an infant, and C.R.G. told the trial judge the standard possession order interfered with her many social and school activities. *Id.* at *2. We concluded the trial court abused its discretion, saying an increase in age alone is not enough "unless changed needs are shown." We explained that trial court made no findings as to C.R.G.'s needs and only found she desired the right to deny her father his times of possession because it interfered with her school and social activities. *Id.* at *4.

These cases are distinguishable on their facts. Mother is not complaining the existing order is interfering with C.M.C.'s social or extracurricular activities or their time together. She presented evidence that the school-day travel schedule is impacting C.M.C.'s ability to focus at school. Although Father testified he believed Mother was motivated by the gymnastics dispute, the evidence showed that issue was resolved.

Moreover, in addition to evidence regarding the effects of the travel schedule on C.M.C., other evidence showed Mother and Father could not co-parent amicably. Mother testified Father

–10–

no longer communicated with her regarding C.M.C. and, instead, required her to communicate with Stepmother. Additionally, evidence showed Father had engaged in vulgar, profane, derogatory and insulting communications with Mother, which are inconsistent with good co-parenting. *See In re A.E.A.*, 406 S.W.3d 404, 418 (Tex. App.—Fort Worth 2013, no pet.). That some of these communications occurred after Mother filed the petition to modify is irrelevant to our analysis. *See In re A.B.P.*, 291 S.W.3d 91, 95 (Tex. App.—Dallas 2009, pet. denied) (stating that to demonstrate material and substantial change in circumstances, evidence must show what conditions existed at time of entry of prior order compared to circumstances existing at time of hearing on motion to modify).

Finally, Father relies heavily on public policy of this State to argue the trial court should not have limited him to standard possession. We agree the public policy of this State is to assure children have "frequent and continuing contact with parents who have shown the ability to act in the best interest of the child" and to "encourage parents to share in the rights and duties of raising their child" after parents have ended their relationship. *See* TEX. FAM. CODE ANN. § 153.001(a). However, courts are permitted to place limitations on a parent's possession of a child if such limitations are necessary for the child's best interest. Having reviewed the evidence, we conclude the trial court did not abuse its discretion in finding a material and substantial change in circumstances had occurred warranting a change in Father's possession schedule and that the modification was in C.M.C.'s best interest. We overrule the first issue.

In his second issue, Father contends Mother failed to prove a material and substantial change of circumstances to justify imposing child support. As with possession, the family code authorizes a trial court to modify a child support order if the circumstances of the child or a person affected by the order have materially and substantially changed since the date the order was rendered. TEX. FAM. CODE ANN. § 156.401(a)(1)(A) (West Supp. 2016). The material and

substantial change is not necessarily a change in the financial condition of one of the parties; it can involve a change in custody of the child. *In re A.M.W.*, 313 S.W.3d 887, 891 (Tex. App.—Dallas 2010, no pet.). The person seeking the modification has the burden of establishing a material and substantial change. *In re C.H.C.*, 392 S.W.3d at 349. Absent a clear abuse of discretion, the trial court's order will not be disturbed on appeal. *Id.*

At the time of trial, Father had a net monthly income of $10,000, and Mother earned $22 an hour working thirty hours a week. Under the 2006 order, Father was no longer required to pay child support once he and Mother began sharing equal possession of C.M.C. when she turned eighteen months old. But the trial court modified the possession schedule from alternating weeks to standard possession, meaning that C.M.C. will no longer be spending every other week at her Father's house. Under these circumstances, we cannot conclude the trial court abused its discretion by ordering Father to pay child support. *See Labowitz v. Labowitz*, 542 S.W.2d 922, 925 (Tex. Civ. App.—Dallas 1976, no writ) (concluding father's appointment as managing conservator of children constituted material and substantial change requiring reallocation of financial obligations; *In re Z.B.P.*, 109 S.W.3d 772, 781–82 (Tex. App.—Fort Worth 2003 (concluding material change in circumstance shown when children no longer lived with Mother during week so Mother not furnishing same degree of services, and Father was furnishing more services to children than at time of divorce), *disapproved on other grounds by Iliff v. Iliff*, 339 S.W.3d 74, 84 n.8 (Tex. 2011). We overrule the second issue.

In his third issue, Father asserts "potential error" in the trial court's failure to make requested findings of fact and conclusions of law. Father asks that we abate the appeal and remand for entry of such findings but only if this Court "believes findings are necessary to evaluate" the appeal.

A trial court's failure to respond to a timely request for findings of fact and conclusions of law is error and is presumed harmful unless the record before the appellate court affirmatively shows the complaining party has suffered no harm. *Cherne Indus., Inc. v. Magallanes*, 763 S.W.2d 768, 772 (Tex. 1989). The general rule is an appellant has been harmed if, under the circumstances of the case, he has to guess at the reason the trial court ruled against him. *Larry F. Smith, Inc. v. The Weber Co.*, 110 S.W.3d 611, 614 (Tex. App.—Dallas 2003, pet. denied).

Father has thoroughly briefed his issues on appeal and does not argue that he has been left to "guess" at the reason the trial court ruled against him. Moreover, the lack of findings has not impacted our ability to evaluate his issues. We overrule the third issue.

We affirm the trial court's order modifying the parent-child relationship.

/Molly Francis/
MOLLY FRANCIS
JUSTICE

151359F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF C.M.C., A CHILD

No. 05-15-01359-CV

On Appeal from the 470th Judicial District Court, Collin County, Texas
Trial Court Cause No. 470-50545-06.
Opinion delivered by Justice Francis; Justices Lang and Stoddart participating.

In accordance with this Court's opinion of this date, the trial court's order in suit to modify the parent-child relationship is **AFFIRMED**.

It is **ORDERED** that appellee Sherry Hulsey recover her costs of this appeal from appellant Mark Lee Currington.

Judgment entered November 9, 2016.